Kevin NEISWONGER and Taunia
Neiswonger, Plaintiffs,

v.

B.K. HENNESSEY, Officer, individually
and as a member of the Morgantown
Police Department and Morgantown
City Police Department, Defendants.

No. Civ.A. 1:99CV62.

United States District Court,
N.D. West Virginia.

Feb. 25, 2000.

David A. Jividan, James B. Stoneking, Bordas, Bordas & Jividan, Wheeling, WV, for plaintiffs Kevin Neiswonger, Taunia Neiswonger.

Michael Kozakewich, Jr., Steptoe & Johnson, Clarksburg, WV, for defendants B.K. Hennessey, Morgantown City Police Department.

*MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' FEDERAL CLAIMS AND DISMISSING PLAINTIFFS' STATE CLAIMS WITHOUT PREJUDICE*

KEELEY, District Judge.

## I. *INTRODUCTION*

On February 10, 2000, the Court held a hearing on defendants' motion for summary judgment [Docket No. 38]. The plaintiffs appeared by counsel, David A. Jividen and James B. Stoneking. The defendants appeared in person through Officer Byron K. Hennessey and Captain Gregory Fleming of the Morgantown City Police Department, as well as by counsel, Michael Kozakewich, Jr. The Court heard oral argument on defendants' motion for summary judgment regarding both plaintiffs' federal and state law claims. After due consideration of the arguments presented in the written briefs [Docket Nos. 38, 40 and 41] and through counsels' oral arguments, the Court **GRANTS** defendants' motion for summary judgment in part, **DISMISSING WITH PREJUDICE** plaintiffs' federal claims, brought pursuant to 42 U.S.C. § 1983, and **DISMISSING WITHOUT PREJUDICE** plaintiffs' state law claims, over which the Court declines to exercise its supplemental jurisdiction.

The pertinent issues presented in defendants' motion for summary judgment are: (1) Whether the defendants are not liable as a matter of law for the alleged violation of plaintiff's constitutional rights, pursuant to § 1983; and (2) Whether the defendants are immune from liability on plaintiffs' state law claims, pursuant to West Virginia's Governmental Tort Claim and Insurance Reform Act?

## II. *FACTS*

The material facts are largely undisputed and all inferences to be drawn from the facts have been considered in the light most favorable to the plaintiffs. *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Between 1:30 a.m. and 2:00 a.m. on the morning of November 8, 1998, Officer Hennessey and his partner Patrolman Webber responded to a reported car alarm at 148 Hoffman Avenue in Morgantown. On arrival at the scene, the officers determined that the source of the alarm was a burglar alarm, not a car alarm. Officer Hennessey observed a man loading items

into a vehicle, outside the residence from which the burglar alarm was emitting. The man was wearing a either a white or yellow T-shirt but no jacket or sweater despite the cool temperature. Officer Hennessey approached the man and began asking him questions regarding the burglar alarm and his identity. The man identified himself as Kevin Neiswonger, the plaintiff. Officer Hennessey then observed what appeared to be blood on Mr. Neiswonger's T-shirt.[1] Immediately after Officer Hennessey inquired about the blood and before Mr. Neiswonger had an opportunity to respond, Patrolman Webber ran past Officer Hennessey towards the residence with his gun drawn, yelling "Cuff him!" or "Restrain him!"

Officer Hennessey, unaware of what Patrolman Webber had observed but knowing that the removal of his gun from his holster indicated that the use of deadly force could be imminent, reacted by taking Mr. Neiswonger to the ground in order to protect Mr. Neiswonger and himself from possible gunfire. He was also acting to protect himself in the event Mr. Neiswonger was armed and/or an accomplice of whomever Patrolman Webber had observed.[2]

The parties dispute whether or not Officer Hennessey hand-cuffed Mr. Neiswonger while he was on the ground. Officer Hennessey does not believe that he did, while Mr. Neiswonger asserts that he was hand-cuffed. Because all facts are viewed in the light most favorable to the non-moving party, the Court assumes for purposes of its analysis that Officer Hennessey did hand-cuff Mr. Neiswonger while he was lying on the ground. It is undisputed that Mr. Neiswonger was not actively resisting arrest or attempting to flee at the time that he was taken to the ground. He

made no threatening movements nor acted in a hostile manner towards the police at any time. It is also undisputed that Officer Hennessey did not act with hostility or animus of any kind towards Mr. Neiswonger at any time.

After Patrolman Webber confirmed that the situation inside the house was stable, Officer Hennessey released Mr. Neiswonger and obtained a blanket for him as he complained of being chilled. The officers were subsequently able to establish that Mr. Neiswonger and a friend, Andrew French, were staying at 148 Hoffman Avenue, the home of Jim Ayersham, following a WVU home football game. Mr. Ayersham had left the residence to go to a bar. Mr. Neiswonger and Mr. French decided to order a pizza to be delivered. Because neither knew the house number, Mr. French opened the front door of the residence to check the number, accidentally activating the burglar alarm. Unable to turn off the alarm, Mr. Neiswonger was in the process of packing his personal belongings into his car, intending to leave Hoffman Avenue and spend the night with other friends, when Officer Hennessey and Patrolman Webber arrived on the scene.

While Officer Hennessey had been questioning Mr. Neiswonger, Patrolman Webber had observed the legs of an individual moving in an opening into the attic. Believing that the individual could be attempting to escape the scene of a burglary or possibly reaching for a weapon, Patrolman Webber had run towards the house with his gun drawn, yelling to Officer Hennessey to restrain Mr. Neiswonger. Patrolman Webber ordered the individual to come out onto the porch. It was subsequently established that the individual observed by Patrolman Webber was Mr.

---

1. It was later determined that the stain on the T-shirt was ketchup, not blood.

2. The parties dispute the manner in which Officer Hennessey took Mr. Neiswonger to the ground. Mr. Neiswonger asserts that Officer Hennessey kicked him in the leg. Officer Hennessey claims that he pushed Mr. Neis-

wonger on his shoulder and upper arm. Because the precise method in which Officer Hennessey took Mr. Neiswonger to the ground is not a material fact in dispute, the Court need not resolve this question. It is undisputed that as a result of being taken to the ground, Mr. Neiswonger sustained the injury of which he complains.

French and he had been in the attic attempting to deactivate the burglar alarm.

Mr. French and one of the back-up officers, whom Patrolman Webber had called for at the time he approached the house with his gun drawn, located Mr. Ayersham and brought him back to Hoffman Avenue to verify Mr. Neiswonger's and Mr. French's story.

While waiting for Mr. Ayersham to arrive, Officer Hennessey repeatedly offered medical treatment to Mr. Neiswonger, who had indicated that his ankle had been injured when he was taken to the ground by Officer Hennessey. Mr. Neiswonger, apparently believing that his ankle was only sprained, refused repeated offers of medical treatment. Mr. Neiswonger was able to walk on his injured leg. It was not until the next day when he returned to his home in Moundsville, West Virginia that Mr. Neiswonger sought medical attention. A doctor there informed him that he had fractured his right leg. It is undisputed that Mr. Neiswonger did not lodge any type of complaint with the Morgantown City Police Department regarding the incident, and that neither defendant had any reason to know that Mr. Neiswonger's injury was more serious than initially supposed until they received the Complaint.

### III. *PROCEDURAL HISTORY*

Mr. Neiswonger filed suit against Officer Hennessey and the police department, in the Circuit Court of Monongalia County, Civil Action No. 99–C–108, on March 11, 1999. The defendants promptly removed the case to this Court on March 26, 1999.

In their complaint, Mr. Neiswonger and his wife allege in Count One that Officer Hennessey committed a violent battery on Mr. Neiswonger in violation of 42 U.S.C. § 1983, the First, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States. In Count Two, the plaintiffs allege that the Morgantown City Police Department is liable for Officer Hennessey's actions:

a. By failing to properly screen and evaluate for positions of police officers with the Morgantown City Police Department, such that individuals of violent and unstable temperaments have become employed as police officers with and for the City of Morgantown;

b. By failing to properly train its police officers;

c. By failing to properly discipline police officers for actions such as those committed by the defendant, Officer Hennessey;

d. By failing to discipline or otherwise reprimand the said Officer Hennessey for prior acts of misconduct, including previous incidents of abuse;

e. By failing to adequately supervise its police officers;

f. And by otherwise adopting and participating in policies and customs which permitted and condoned activities such as those complained of by the plaintiff in this complaint.

Complaint, at 4, ¶ 14. Plaintiffs fail to specify in their complaint whether the allegations in Count Two arise under state or federal law. In Count Three, plaintiffs allege that Officer Hennessey's conduct constituted assault, battery, intentional infliction of emotional distress, and abuse of process, under state law.

In their motion for summary judgment [Docket No. 38], defendants argue that Officer Hennessey's use of force was objectively reasonable, and, therefore, no violation of Mr. Neiswonger's constitutional rights occurred. In the alternative, defendants' argue that Officer Hennessey is afforded the protection of qualified immunity. Furthermore, defendants argue that no municipal liability attaches to the police department under § 1983 because no constitutional violation occurred, and that, even if it did, plaintiffs have failed to show that a custom or policy of the department was the moving force behind the alleged constitutional violation.

In their response [Docket No. 40], plaintiffs respond that Officer Hennessey's ac-

tions were not objectively reasonable given that plaintiff posed no safety threat, was not resisting arrest, and there were other less drastic steps that Officer Hennessey should have taken to protect Mr. Neiswonger from potential gunfire. They further argue that the police department is subject to municipal liability because it was the "custom" of the department to ignore its progressive use of force policy.[3] Furthermore, plaintiffs argue that the department acted with deliberate indifference to the known consequences of its "custom."

The defendants' reply to plaintiffs' response [Docket No. 41] notes that plaintiffs have failed to articulate any reason other than the one given by Officer Hennessey for his actions on November 8, 1998. Officer Hennessey's explanation is that he acted to protect both Mr. Neiswonger and himself from the perceived danger of the situation.

Finally, Defendants' argue that if this Court dismisses the federal claims, it should retain supplemental jurisdiction over the state law claims and dismiss them too because Officer Hennessey is immune from liability for negligent acts performed within the scope of his employment under West Virginia's Governmental Tort Claim and Insurance Reform Act. Because Officer Hennessey acted without the intent to harm Mr. Neiswonger, defendants argue, plaintiffs' state intentional tort claims should also be dismissed. At the hearing on defendants' motion for summary judgment, defendants further argued that the Police Department cannot be held liable for negligent acts performed by Officer Hennessey within the scope of his employment because plaintiffs failed to allege a negligence cause of action against the Police Department under state law.

Plaintiffs urge the Court to exercise its discretion and decline jurisdiction over the pendent state law claims, in the interests of comity. Plaintiffs asserted at the hearing that Count Two of the Complaint sets forth a negligence cause of action, under state law, against the Police Department.

## IV. *STANDARD OF REVIEW*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

However, Rule 56 mandates that summary judgment be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Furthermore, as the United States Supreme Court noted in *Anderson v. Liberty Lobby, Inc.,* Rule 56 provides that "a party opposing a properly supported motion for summary judgment 'may not rest upon mere allegations or denials of [the] pleading', but ... must set forth specific facts showing that there is a genuine issue for trial." 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Court grants defendants' motion for summary judgment on plaintiffs' federal

---

**3.** The Morgantown Police Department's General Order 4.1 sets forth its Use of Force policy (revised 09/12/94). The policy provides that "Police department employees will use only the minimum amount of force which is necessary and reasonable to control a situation, effect an arrest, overcome resistance to arrest, or defend themselves or others from harm." § 4.1.3.B. The policy further provides

that "Police officers have been delegated the awesome responsibility to protect life and property and apprehend criminal offenders. The apprehension of criminal offenders and protection must at all times be subservient to the protection of life. The police officer's responsibility for protecting life shall include their own." § 4.1.8.B.

claims because, after adequate time for discovery, plaintiffs have failed to establish the existence of facts to support their § 1983 claims, as set forth in detail below.

## V. *ANALYSIS*

### A. *Federal Claims*

#### 1. Liability of Officer Hennessey

█ The parties agree that plaintiff's § 1983 claim is most appropriately evaluated under the Fourth Amendment's right to be free from unreasonable search and seizure.[4] "All claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

█ Officer Hennessey had stopped the plaintiff and was in the process of asking him questions both to establish his reasons for being on the scene and his identity when the conduct being complained of occurred. "Whenever an officer restrains the freedom of a person to walk away, he has seized that person." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), *citing United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Counsel for defendants at the hearing on the motion for summary judgment agreed that Mr. Neiswonger was not free to walk away from Officer Hennessey at the time that he was being questioned and was taken to the

ground.[5] Accordingly, the Court finds that Mr. Neiswonger was "seized" by Officer Hennessey for purposes of conducting a Fourth Amendment analysis.

█ To determine the constitutionality of a seizure, courts must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), *citing United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). The balancing of competing interests is the key principle of the Fourth Amendment and "because one of the factors is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out." *Garner*, 471 U.S. at 8, 105 S.Ct. 1694, *citing United States v. Ortiz*, 422 U.S. 891, 895, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975) and *Terry v. Ohio*, 392 U.S. 1, 28–29, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968).

█ Force is not considered excessive if it is objectively reasonable under the circumstances facing a police officer, without regard to the officer's underlying intent. Objective reasonableness is judged from the point of view of a reasonable officer on the scene. The reasonableness of the force employed is assessed considering the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or oth-

---

4. In *Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court rejected the use of a generic substantive due process analysis of Section 1983 excessive force claims and held that such claims are analyzed under the Fourth Amendment's "objective reasonableness standard." In addition, plaintiffs have failed to establish the existence of any facts to support their claim that Officer Hennessey violated Mr. Neiswonger's rights under the First Amendment of the Constitution, as alleged in their complaint.

5. Counsel for plaintiffs indicated for the first time at oral argument that they believe Officer Hennessey intended to arrest Mr. Neiswonger. However, it is undisputed that Officer Hennessey never placed Mr. Neiswonger under arrest or threatened to do so throughout this incident. Given that the Court finds that Mr. Neiswonger was "seized" and the Fourth Amendment's "objective reasonableness" analysis applies, an inquiry into Officer Hennessey's subjective intent is not required. Therefore, the Court need not determine whether Officer Hennessey intended to arrest Mr. Neiswonger or not.

ers, and whether he is actively resisting arrest or attempting to évade arrest by flight." *Sigman v. Town of Chapel Hill,* 161 F.3d 782, 786 (4th Cir.1998) *citing Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

> This evaluation is guided by the pragmatic considerations of the moment and not by those that can be hypothesized from an armchair. Thus, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the $^{20}$⁄₂₀ vision of hindsight. The calculus of reasonableness must embody allowances for the fact that police officers are forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Sigman,* 161 F.3d at 787, *citing Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865. A court's focus should be on the circumstances at the moment the force was used, given that officers on the beat are not often afforded the luxury of armchair reflection. *Greenidge v. Ruffin,* 927 F.2d 789, 791–92 (4th Cir.1991).

Viewing the totality of the circumstances facing Officer Hennessey in the early hours of November 8, 1998, the Court finds that his conduct in knocking Mr. Neiswonger to the ground to protect himself and Mr. Neiswonger from the possible use of deadly force by Patrolman Webber and whomever he had observed inside the residence, was not objectively unreasonable. Although Mr. Neiswonger was complying with Officer Hennessey's instructions and was co-operating with him, Officer Hennessey had not yet been able to verify Mr. Neiswonger's story. He was confronted by a man, dressed inappropriately, loading items into a vehicle outside a residence where a burglar alarm was sounding, with what appeared to be blood on his clothing. While questioning Mr. Neiswonger, his fellow officer ran past him with his gun drawn, indicating that the use of deadly force could be imminent, yelling that officer Hennessey should hand-cuff or otherwise restrain Mr. Neiswonger.

Given the rapidly evolving situation and the fact that Officer Hennessey had no way of knowing what Patrolman Webber had observed inside the residence or whether Mr. Neiswonger was an innocent citizen or an accomplice of an armed felon inside the residence, he reacted by knocking Mr. Neiswonger to the ground, thereby protecting Mr. Neiswonger in the event that gunfire was exchanged and protecting himself in the event that Mr. Neiswonger was armed or was a criminal accomplice.

Plaintiffs argue that by hand-cuffing Mr. Neiswonger, Officer Hennessey was not acting to protect Mr. Neiswonger. However, this argument overlooks the fact that Officer Hennessey had a duty to protect himself as well as Mr. Neiswonger. Assuming, as this Court must, that Officer Hennessey hand-cuffed Mr. Neiswonger, this does not negate the reasonableness of his actions. Officer Hennessey needed to maintain control of the situation outside of the residence while Patrolman Webber was handling the emerging situation inside the residence. Hand-cuffing Mr. Neiswonger under the circumstances would have been objectively reasonable. "The Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm." *Elliott v. Leavitt,* 99 F.3d 640, 641 (4th Cir.1996). Police officers are not required to wait until a suspect shoots to confirm that a serious threat of harm exists. *Id.* at 643.

Plaintiffs argue that there were other more appropriate actions that Officer Hennessey could have taken under the circumstances, such as shouting a warning to Mr. Neiswonger and moving him behind a car. However, this is precisely the type of second-guessing, "armchair judgment" that is prohibited by the United States Supreme Court and the Fourth Circuit. "The suggestion that the officers might have responded differently is exactly the type of judicial second look that the case law prohibits." *Id.* at 643.

Accordingly, the Court finds that officer Hennessey's conduct was objectively reasonable and that a reasonable officer in the same circumstances would have concluded that a threat existed justifying this particular use of force. Officer Hennessey acted reasonably under the circumstances to protect both Mr. Neiswonger and himself, in accordance with the Morgantown City Police Department's Use of Force policy. Officer Hennessey did not violate Mr. Neiswonger's Fourth Amendment right to be free from unreasonable search and seizure.

### 2. Officer Hennessey and Qualified Immunity

Assuming *arguendo,* that Officer Hennessey is not absolutely immune from liability under 42 U.S.C. § 1983 as discussed in the preceding section, the Court finds that he would also be entitled to qualified immunity.

 Qualified immunity protects government officials from suits for civil damages arising out of the exercise of their discretionary functions. This immunity is available when the conduct of a government employee does not violate a clearly established statutory or constitutional right of which a reasonable person would have known. *Gould v. Davis,* 165 F.3d 265 (4th Cir.1998). The Fourth Circuit has divided the analysis of qualified immunity into three parts: "First, we must identify the right allegedly violated; second, we must decide whether the right was clearly established at the time of the alleged violation; and third, we must determine whether a reasonable person in the officer's position would have known that his or her actions violated that right." *Id.* at 269, *citing Smith v. Reddy,* 101 F.3d 351, 355 (4th Cir.1996).

In identifying the constitutional right allegedly violated, the right infringed must be identified with a high level of particularity. *McDerment v. Browning,* 18 F.Supp.2d 622, 626 (S.D.W.Va.1998), *citing Jean v. Collins,* 155 F.3d 701, 707 (4th Cir.1998). For example, in *McDerment*

plaintiff's right was to be free from excessive force in the course of a Fourth Amendment seizure brought about by officers who used substantial physical force and pepper spray against him knowing that he was mentally and physically handicapped and knowing that he was on his family's property at all times prior to and during the seizure. In *Vathekan v. Prince George's County,* 154 F.3d 173, 179 (4th Cir.1998), plaintiff's claim was based on her right to be free from excessive force in the course of a Fourth Amendment seizure brought about by a police dog that was deployed without a verbal warning. In *McCall v. Williams,* 52 F.Supp.2d 611, 620 (D.S.C.1999), the right was defined as a person's Fourth Amendment right to be free from the use of excessive force by law enforcement in tightly handcuffing a suspect to effect an arrest or during an investigatory stop.

Having identified the specific constitutional right, courts must then determine whether the established contours of the right were sufficiently clear at the time of the seizure to make it plain to reasonable officers that their actions under these circumstances violated a plaintiff's rights. *Vathekan,* 154 F.3d at 179, *citing Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) and *Wilson v. Layne,* 141 F.3d 111, 114 (4th Cir.1998) (the exact conduct at issue need not have been held unlawful so long as the unlawfulness of the conduct is manifest under existing authority). In *Jean v. Collins,* the Fourth Circuit instructed district courts to consider only the decisions of the United States Supreme Court, the Fourth Circuit and applicable state law in determining whether a specific right was clearly established at the time that the alleged violation of a constitutional right occurred. 155 F.3d 701, 709 (4th Cir.1998).

 At the hearing held in this matter, the plaintiffs' attorneys asserted that Mr. Neiswonger's constitutional right to be free from the use of excessive force was violated by Officer Hennessey's failure to

follow his department's progressive Use of Force policy. The Court has been unable to find and plaintiffs have not supplied this Court with any cases establishing that the contours of such a constitutional right were clearly established in November 1998.

The Court finds that it is not clear that Mr. Neiswonger had a specific constitutional right not to be knocked to the ground by a police officer without a verbal warning or other minimal use of force, when the police officer feared that he and the plaintiff were in immediate danger of being caught in the line of fire. Even if Mr. Neiswonger had such a constitutional right, it is not clear that a reasonable officer would have understood that taking a plaintiff to the ground to protect himself and the plaintiff would violate such plaintiff's constitutional rights.

The final prong of the qualified immunity analysis requires the Court to look at the reasonableness of the officer's actions, given the totality of the circumstances. This is the same inquiry as that used in the preceding section to determine the objective reasonableness of Officer Hennessey's actions. The objective reasonableness of the force used must be assessed with an eye toward the proportionality of the force in light of all of the circumstances. *Vathekan,* 154 F.3d at 179, *citing Rowland v. Perry,* 41 F.3d 167, 173 (4th Cir.1994). "Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness." *Rowland v. Perry,* 41 F.3d 167, 173 (4th Cir. 1994).

Viewing all of the circumstances and the immediate threat to his and Mr. Neiswonger's safety that Officer Hennessey perceived, the Court finds that the force used by Officer Hennessey was objectively reasonable and proportionate to the perceived danger. The Court, therefore, concludes that he would be entitled to qualified immunity under the circumstances.

### 3. Municipal Liability of the Police Department

It is well-settled that a municipality is only liable under § 1983 if a plaintiff suffers a deprivation of his federal rights because of an official policy or custom. *Carter v. Morris,* 164 F.3d 215 (4th Cir. 1999) (requiring that there be a close fit between the allegedly unconstitutional policy and the constitutional violation.) Where an officer's actions are reasonable, as here, the Court need not address a plaintiff's federal claims against the police department because "in the absence of any underlying use of excessive force ... liability cannot be placed on either the non-shooting officer, a supervisor, or the City." *Sigman v. Town of Chapel Hill,* 161 F.3d 782, 788 (4th Cir.1998), *citing Hinkle v. City of Clarksburg,* 81 F.3d 416, 420 (4th Cir.1996). *See also Kopf v. Wing,* 942 F.2d 265, 269 (4th Cir.1991) (holding that municipal liability is derivative of, but narrower than, the liability of an individual officer).

Accordingly, the Morgantown City Police Department cannot be held liable under federal law given that Officer Hennessey did not use excessive force in violation of Mr. Neiswonger's constitutional rights. However, assuming *arguendo,* that Mr. Neiswonger's constitutional rights had been violated, the Police Department would still not be subject to municipal liability because plaintiffs have failed to establish that an official policy or custom of the department's caused the constitutional violation.

In *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the United States Supreme Court overruled its prior decision in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), insofar as it had held that local governments were wholly immune from suit under § 1983. After conducting an extensive analysis of the legislative history of § 1983, the Court found that the language of § 1983

compels the conclusion that Congress did not intend municipalities to be held liable unless some action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable solely because it employs a tort-feasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.... [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 691–94, 98 S.Ct. 2018.

■ The Fourth Circuit has held that plaintiffs seeking to impose liability on a municipality must, therefore, adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights. *Semple v. City of Moundsville,* 195 F.3d 708, 712 (4th Cir.1999), *citing Jordan by Jordan v. Jackson,* 15 F.3d 333, 338 (4th Cir.1994). Thus, a prerequisite to municipal liability is finding that an official policy or custom existed.

■ Furthermore, courts must be careful not to slip into the forbidden realm of respondeat superior when considering a plaintiff's allegations that a municipality either had a policy of deliberate indifference or condoned unconstitutional conduct. *Carter v. Morris,* 164 F.3d 215, 218 (4th Cir.1999), *citing Board of County Commissioners v. Brown,* 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (rigorous standards of culpability and causation must be applied to ensure that municipality is not held liable solely for the actions of its employees).

A plaintiff cannot rely on scattershot accusations of unrelated constitutional violations to prove either that a munici-

pality was indifferent to the risk of her specific injury or that it was the moving force behind her deprivation.... Thus, municipal liability will attach only for those policies or customs having a specific deficiency or deficiencies such as to make the specific violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run. *Id.* at 218, *citing Spell v. McDaniel,* 824 F.2d 1380, 1390 (4th Cir.1987). *See also Carter,* 164 F.3d at 219 ("permitting plaintiffs to splatter-paint a picture of scattered violations also squanders scarce judicial and municipal time and resources").

■ The general analytical framework for imposing municipal liability for violations of § 1983 requires that courts look at "(1) identifying the specific policy or custom; (2) fairly attributing the policy and fault for its creation to the municipality; and (3) finding the necessary affirmative link between the identified policy or custom and specific violations." *Spell,* 824 F.2d at 1389. A single violation is insufficient to establish the causal connection between the existence of a policy or custom and the alleged violation. *Id* at 1388.

Although Count Two of the plaintiffs' complaint can fairly be characterized as taking a "scattershot" or "splatter-paint" approach, plaintiffs have focused their arguments before this Court on the alleged "custom" of officers within the Police Department to ignore its progressive Use of Force policy. General Order 4.1 of the Morgantown Police Department requires that

The use of force by employees of the department will, whenever possible, be progressive in nature. This force may be in the form of advice, warnings, persuasion, verbal encounters, physical contact, use of nonlethal weapons, or the use of deadly force.

Employees must weigh the circumstances of each individual case and employ only that amount of force which is necessary and reasonable to control the situation or persons. No employee will

use excessive or unreasonable force toward any person.

General Order, §§ 4.1.3.D.–4.1.3.E.

Plaintiffs seek to argue that Officer Hennessey failed to follow this policy when he took Mr. Neiswonger to the ground without first giving him a verbal warning or taking some other less forceful action. Accordingly, plaintiffs argue that the Police Department should be held liable because it knew that its policy was being ignored by its officers, and the failure to follow the policy is tied to the violation of Mr. Neiswonger's constitutional rights.

 Custom and usage may serve as the basis for municipal liability if the persistent and widespread practices of municipal employees which, although not authorized by written law, are so permanent and well-settled as to have the force of law. *Spell,* 824 F.2d at 1386, *citing Monell.* "Actual knowledge may be evidenced by recorded reports to or discussions by a municipal governing body. Constructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them." *Spell,* 824 F.2d at 1387. Proof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom. *Semple,* 195 F.3d at 713.

 Plaintiffs have alleged a specific "custom" but have failed to establish that it was persistent or widespread throughout the department. At oral argument, counsel for defendants pointed out that only one excessive force complaint had been filed against the City in the preceding ten years—a complaint which a jury found to be without merit. Furthermore, Officer Hennessey, in his deposition, had testified about two incidents where arrestees complained to him about his use of force. One occasion involved an individual whose arm was skinned when he was tackled by Officer Hennessey after trying to evade capture. On the second occasion, an arrestee complained that his handcuffs were too

tight. Plaintiffs' counsel has failed to point to any evidence in either its brief or at oral argument to support its contention that a custom of ignoring the progressive use of force policy existed within the Police Department.

Furthermore, plaintiffs have failed to establish a link between the alleged custom and the specific violation alleged here. Even after considering all of the evidence in the light most favorable to plaintiffs, the Court can find nothing to substantiate plaintiffs' claims that the Police Department's alleged custom of ignoring its progressive use of force policy made the specific alleged violation "almost bound to happen, sooner or later." *Carter,* 164 F.3d at 218.

Finally, although counsel for plaintiffs, through both their brief and also their arguments to this Court, implied that plaintiffs had alleged that the Police Department should be held liable under § 1983 in Count Two of their complaint, in an unexpected *volte face* towards the end of the February 10, 2000 hearing, counsel claimed that Count Two of the Complaint was actually intended to set forth a negligence claim against the Police Department under state law. That position suggests that plaintiffs' federal municipal liability claim against the Police Department has been withdrawn; in any case, it would otherwise have failed as a matter of law.

**B. *State Law Claims***

 Having determined that summary judgment is appropriate on plaintiffs' federal law claims, the Court next turns to whether it should retain supplemental jurisdiction over plaintiffs' remaining state law claims. In *Semple v. City of Moundsville,* 195 F.3d 708 (4th Cir.1999), the Fourth Circuit affirmed the district court's grant of defendants' motion for summary judgment and its retention and dismissal of the pendent state law claims, noting that

A district court may exercise its discretion over state law claims made in the

case through supplemental jurisdiction pursuant to 28 U.S.C. § 1367 when there is a federal basis for jurisdiction. See *Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir.1995). A district court exercises its discretion by considering factors that include "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, or considerations of judicial economy."

195 F.3d at 714. In the interests of comity, this Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims given that state law is unclear on some of the legal issues that this Court would be required to resolve.

West Virginia Code § 29–12A–5(b) provides that employees of political subdivisions are immune from liability unless their acts are manifestly outside the scope of employment or official responsibilities, their acts were with malicious purpose, in bad faith or in a wanton or reckless manner, or liability is expressly imposed upon them by another provision of this Code. Plaintiffs recognize that, under West Virginia law, Officer Hennessey cannot be held individually liable if he acted in a negligent manner within the scope of his employment. However, at oral argument, plaintiffs argued that a jury might find that Officer Hennessey had acted recklessly, asserting there is no West Virginia case law discussing the parameters of a recklessness claim against an otherwise qualified employee under the Tort Claim Act.

Moreover, while the defendants recognize that a political subdivision, such as the Morgantown City Police Department, may be held liable for the negligent acts of its employees, pursuant to W.Va.Code § 29–12A–4(c), *Beckley v. Crabtree*, 189 W.Va. 94, 428 S.E.2d 317 (1993) and *Mallamo v. Town of Rivesville*, 197 W.Va. 616, 477 S.E.2d 525 (W.Va.1996), they argue that the plaintiffs failed to allege a state law negligence claim against the Police Department in their complaint.

As noted above, when pressed on the point at oral argument, counsel for plaintiffs characterized Count Two of the Complaint, which the court took to set forth a claim under 42 U.S.C. § 1983, as setting forth a claim that the Police Department was negligent under State law. Despite the implicit illogic of this argument, given that counsel had already briefed and argued the liability against the municipality under federal law, these issues relate to the nature and adequacy of plaintiffs' state law claims, and, therefore, the Court declines to exercise its supplemental jurisdiction over them and will dismiss them without prejudice.

## VI. *CONCLUSION*

For all of the foregoing reasons, this Court concludes that the defendants are entitled to judgment as a matter of law on plaintiffs' federal law claims and such claims are **DISMISSED WITH PREJUDICE** [Docket No. 38]. However, in the interests of comity, this Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims and such claims are hereby **DISMISSED WITHOUT PREJUDICE.**

Because of the disposition of this case by summary judgment and dismissal without prejudice, the following motions are hereby **DENIED AS MOOT:**

1. Plaintiffs' motion in limine No. 1 [Docket No. 42];

2. Plaintiffs' motion in limine No. 2 [Docket No. 43];

3. Plaintiffs' motion in limine No. 3 [Docket No. 44];

4. Plaintiffs' motion in limine No. 4 [Docket No. 45];

5. Defendants' motion in limine No. 1 [Docket No. 49];

6. Defendants' motion in limine No. 2 [Docket No. 50];

7. Defendants' motion in limine No. 3 [Docket No. 51]; and

8. Defendants' motion in limine No. 4 [Docket No. 52].

The Clerk is directed to strike this case from the docket of the Court.

It is so **ORDERED.**